```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/30/14
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                              :
BERKLEY NETWORKS CORPORATION                                  :
d/b/a INMARKIT,                                               :
                                                              :      14cv5145
                      Plaintiff,                              :
                                                              :      MEMORANDUM & ORDER
              -against-                                       :
                                                              :
INMARKET MEDIA, LLC, f/k/a                                    :
CHECKPOINTS LLC, *et al.*,                                    :
                                                              :
                      Defendants.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Berkley Networks Corporation ("Berkley") brings this trademark infringement action against Defendants InMarket Media, LLC ("InMarket Media"), Mark DiPaola, and Todd DiPaola, alleging their use of "inMarket" infringes Berkley's "inMarkit" service mark. Berkley moves to preliminarily enjoin Defendants from using the "inMarket" mark in connection with its shopping application software platform. For the following reasons, Plaintiff's motion for a preliminary injunction is denied.

## BACKGROUND

        In 2009, Berkley registered "inMarkit" with the U.S. Patent and Trademark Office ("USPTO"). "inMarkit" is a mobile and online shopping platform allowing manufacturers and retailers of consumer products to enable shoppers to save and share items while browsing on a website or mobile application. (Compl. ¶ 2.) Berkley's "inMarkit" technology also provides consumers with mobile notifications alerting them when a retailer's nearby brick-and-mortar store carries those items, and when a manufacturer or retailer offers discounts or incentives. (Compl. ¶ 2).

Defendant InMarket Media, LLC ("InMarket Media") originated under the name Checkpoints, LLC ("Checkpoints"). Checkpoints was incorporated in 2010. (M. DiPaolo Decl. ¶ 4.) Initially, Checkpoints encouraged users to "check in" to retail stores and scan product bar codes with their smartphone cameras to earn points that could be redeemed for rewards. (T. DiPaolo Decl. ¶ 3.) In turn, the Checkpoints app enabled retailers to provide targeted advertising to consumers.

In December 2011, Checkpoint's CEO, Mark DiPaola contacted Berkley's President, Berkley Bowen, to inquire about the "inMarkit" mark. The parties offer differing versions of the impetus for this contact. Berkley asserts that Checkpoints was interested in licensing or purchasing the "inMarkit" mark because it was having "problems with the continued use of [the Checkpoints] name." (Bowen Decl. ¶ 17.) At oral argument, Berkley revealed Checkpoints had been sued for trademark infringement, unfair competition, and deceptive trade practices in May 2011. See Checkpoint Systems, Inc. v. Checkpoints Mobile, LLC, 1:11-cv-03456 (N.D. Ill. 2011). But, InMarket Media maintains that it wanted to "discuss whether [Berkley] was using the mark" because it sought to re-brand its platform to reflect a broader model of helping retailers reach customers when they are "actually *in* the *market* to buy." (M. DiPaola Decl. ¶ 4; T. DiPaola Decl. ¶ 4.) These conflicting accounts about their first contact suggest that all parties were on notice about the importance of intellectual property rights.

Following the meeting, Berkley declined to license or sell the "inMarkit" trademark to Checkpoints. (Bowen Decl. ¶ 18.) Thereafter, in January 2012, Checkpoints announced the rebranding of its business under the name "InMarket."[1] Two days later, Berkley's attorneys sent a cease-and-desist letter demanding that Checkpoints "cease any adoption and use

---

[1] Whether that re-branding occurred in anticipation of a settlement of the trademark action in the Northern District of Illinois is unclear. In any event, Checkpoints executed a final consent judgment in that action on May 1, 2012.

2

of the INMARKET mark immediately." (Bowen Decl. Ex. 8.) On March 6, 2012, InMarket Media f/k/a Checkpoints responded with its own lawyer's letter, disputing Berkley's trademark infringement claims and advising Berkley that it "consider[ed] this matter closed." (Bowen Decl. Ex. 8.) Berkley's attorneys fired off another salvo on April 3, 2012, challenging InMarket Media's claims and reiterating its demand that InMarket Media cease using the "inMarket" name. (Bowen Decl. Ex. 8.) In that letter, Berkley's attorneys trumpeted the USPTO's rejection of InMarket Media's application for the "inMarket" trademark.[2] In rejecting the application, the USPTO found that InMarket Media's mark was "very similar to the registered mark INMARKIT[,] . . . the services are virtually identical" and therefore "confusion as to source is likely." (Bowen Decl. Ex. 9.)

After this exchange of lawyers' letters, brimming with puffery and counter-puffery, radio silence ensued. Given the sophistication of the parties, their attorneys, and the acknowledgement that each side was monitoring the other, it's hard to understand why neither side followed through on its litigation mongering. Perhaps, something else was in play but that remains opaque at this time.

Over the next two years, the parties coexisted in the marketplace. Berkley marketed software through its website and "deployed" its product to customers. (Oral Arg. Tr. at 9.) Meanwhile, InMarket Media grew its business exponentially using the "inMarket" name and received considerable media coverage. In August 2012, Entrepreneur Magazine featured Todd DiPaola on its cover and observed that the "inMarket network [had] more than 20 million users." (T. DiPaola Decl. Ex. D.)

---

[2] On November 29, 2011, prior to any contact with Berkley, Checkpoints filed an application to register "inMarket" with the USPTO. (Bowen Decl. Ex. 6.)

3

In January 2014, InMarket Media announced the roll-out of "iBeacons"—transmitters in retail establishments using Bluetooth technology to communicate with smartphones—to grocery store chains. (T. DiPaola Decl. ¶ 12.) While Berkley maintains that "everything changed" with the implementation of "iBeacons" because it involved location-based services identical to Berkley's (Pl. Br. at 3), InMarket Media characterizes the "iBeacon" technology as an "upgrade" to advertising services it offered years earlier (T. DiPaola Decl. ¶ 13).

The "iBeacons" launch triggered a new round of attorney's letters between Berkley and InMarket Media. On January 17, 2014, Berkley revived its two-year-old demand that Defendants stop using the "inMarket" trademark. (M. DiPaola Decl. Ex. M.) InMarket Media's counsel volleyed back with a flat refusal and a request for more information. (M. DiPaola Decl. Ex. N.) And then, once again, both sides put pencils down and there were no further communications between them until Berkley filed this lawsuit in July 2014. Four months later, Berkley moved for preliminary relief claiming irreparable injury. As this chronology reveals, any emergency is largely one of the parties' own making.

## DISCUSSION

A preliminary injunction is an "extraordinary remedy." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 9 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 24; accord Salinger v. Colting, 607 F.3d 68, 79–80 (2d Cir. 2010).

4

I.  Likelihood of Success on the Merits

Berkley may be able to satisfy its burden that it is likely to succeed on the merits of its suit for trademark infringement. In Polaroid Corp. v. Polaroid Electronics Corp., 287 F.2d 492 (2d Cir. 1961), Judge Friendly enumerated eight factors to analyze the likelihood of confusion between two trademarks: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendants' marks; (3) the proximity of the products and their competitiveness with one another; (4) likelihood that plaintiff will "bridge the gap" between plaintiff's and defendant's products; (5) actual confusion; (6) evidence that the defendants' mark was adopted in bad faith; (7) the respective quality of the products; and (8) the sophistication of buyers in the relevant market. Polaroid, 287 F.2d at 495.

Here, the balance of these factors weighs in favor of Berkley. Berkley is the registered owner of "inMarkit." The products at issue are similar. InMarket Media forged ahead with "inMarket" even though it was well aware of Berkley's rights, and its own efforts to register with the USPTO were rejected. There is also some evidence of customer confusion. But there is little evidence that InMarket Media is exploiting Berkley's position in the marketplace. The converse may be true. Finally, it is worth noting that the market involving mobile shopping services at retail establishments is fiercely competitive with many companies vying for retailers' and consumers' attention.

II.  Irreparable Harm

However, Berkley falls short of demonstrating irreparable harm at this time. A showing of irreparable harm is "the single most import prerequisite for the issuance of a preliminary injunction." Faiveley v. Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). "Irreparable harm exists in a trademark case when the party

5

seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither calculable nor precisely compensable." U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) (citations omitted). A plaintiff needs to prove that the injury it would suffer while waiting for a trial on the merits is "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 510 (2d Cir. 2005).

Berkley contends that it faces irreparable harm in the form of a loss of goodwill with prospective customers who are confused by InMarket Media's branding. For example, Berkley offers evidence of confusion by individuals who navigate to InMarket Media's website by mistake. Berkley also complains of "reverse confusion" because consumers believe Berkley, not InMarket Media, is the infringer. See SLY Magazine, LLC v. Weider Publ'ns LLC, 529 F. Supp. 2d 425, 436 (S.D.N.Y. 2007); Bowen Decl. ¶¶ 36-40.

Berkley's reliance on Bulman where the court explained "[p]rospective loss of . . . goodwill alone is sufficient to support a finding of irreparable harm," is unpersuasive. Bulman v. 2BKO, Inc., 882 F. Supp. 2d 551, 564 (S.D.N.Y. 2012) (internal quotations and citations omitted). In Bulman, plaintiff owned a group photo-sharing and social networking mobile-phone application, marketed under the fanciful name "PINWEEL." Two days after a competitor announced its intention to use "PINWHEEL" in connection with a map-based notes and photo sharing service accessible via www.pinwheel.com, plaintiff demanded they cease and desist. Bulman, 882 F. Supp. 2d at 556-57. Unable to amicably resolve the dispute without litigation, Bulman filed suit and sought preliminary relief the next day by order to show cause. In contrast, this dispute has proceeded at a languid pace.

6

Moreover, Bulman was alarmed at the "imminent release" of defendant's mobile application of its PINWHEEL service. And the court determined that irreparable harm would ensue: "examples of customer frustration and confusion coupled with Defendant's plan to develop and release a Pinwheel app, suggests that future confusion—and accompanying prospective loss of goodwill—is a virtual certainty." Bulman, 882 F. Supp. 2d at 564. Unlike the situation in Bulman, the pivotal infringement Berkley claims to be the source of irreparable harm—the release of the "iBeacon" technology—has already occurred. And it happened eleven months ago. To the extent InMarket Media's announcement regarding "iBeacon" technology "changed everything" for Berkley, that was the time to act. A party cannot remain idle if its valuable intellectual property rights are being infringed. As the Second Circuit has observed, "delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action . . . . Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate the absence of the kind of irreparable harm required to support a preliminary injunction." Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) (citations omitted).

Here, InMarket Media operated a website for two years under the name www.inmarket.com for various mobile computer applications, received significant media attention, and grew its business to include millions of users. Berkley was aware of all of this, and monitored these activities. Berkley's request for swift and extraordinary action belies its lassitude over three years.

While delay alone does not "require" denial of a preliminary injunction, it can be considered. See, e.g., Marks Org., Inc. v. Joles, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011). This is especially true here when this Court previously indicated its intention to expedite discovery

and originally scheduled a trial in February 2015. The notion that Berkley would be irreparably injured if forced to wait until February is undermined by its counsel's suggestion that an evidentiary hearing could be conducted by this Court in February, even though all parties agreed at argument that no evidentiary hearing was necessary. (Oral Arg.Tr. at 53.) Time does not appear to be of the essence to these parties.

### III. Balance of the Equities

The balance of hardships tips, albeit barely, in InMarket Media's favor. A court must consider the balance of hardships between the plaintiff and defendant and issue an injunction only if the balance of hardships tips "decidedly" in the plaintiff's favor. Salinger v. Colting, 607 F.3d 68, 79 (2d Cir. 2010) (citations omitted). InMarket Media rebranded its product at the beginning of 2012. (T. DiPaola Decl. ¶ 8.) Forcing InMarket Media to abandon the "inMarket" name before trial would result in significant expenses associated with changing website and marketing materials, and retooling machinery. (T. DiPaola Decl. ¶ 16.) Of course, after trial InMarket Media may have to do that anyway. But for now, it appears Berkley can continue to coexist with InMarket Media.

### IV. Public Interest

In trademark litigation, "[t]he public interest is best served by removing confusingly similar marks so that the public can more freely access the parties' products." Bulman, 882 F. Supp. 2d at 566. While this factor weighs in favor of Berkley, an expedited and public trial is the best way to vindicate this interest. Expedited discovery should be completed promptly in preparation for jury selection and trial on February 23, 2015.

## CONCLUSION

For the foregoing reasons, Plaintiff Berkley Networks Corporation's motion for a preliminary injunction is denied. Jury selection and trial are reset to February 23, 2015. All time limits for responses to discovery devices under the Federal Rules of Civil Procedure are abbreviated to seven days. The parties are directed to submit a joint pretrial order by February 17, 2015.

Dated: December 30, 2014
       New York, New York

SO ORDERED:

_____
    WILLIAM H. PAULEY III
            U.S.D.J.

*All Counsel of Record*